CASE 64.—ACTION BY MAMIE H. HITE AGAINST LOUIS
HITE FOR A DIVORCE.—January 27, 1910.

## Hite v. Hite

Appeal from Jefferson Circuit Court (Chancery Branch, First Division).

SHACKELFORD MILLER, Judge.

Judgment for plaintiff, defendant appeals.—Affirmed.

1. Husband and Wife—Right to Separate Maintenance.—Where a husband, addicted to the excessive use of liquor, would, during his sprees, assault his wife and abuse her openly and publicly, and would, in the presence of others, act as though she was not conducting herself properly, and he was spying on her to detect her improper relations with some one, and sought by hints in the presence of others to insinuate that she was too intimate with a friend of his, she was entitled to a decree of separate maintenance.

2. Husband and Wife—Contracts for Separate Maintenance—Consideration.—Where a husband and wife were living apart and the wife was just recovering from a beating which the husband had given her, furnishing good cause for divorce, which would carry with it alimony, when she agreed with him to resume the marriage state, he promising to make suitable provisions for her support if she were again compelled to leave him, her waiver of her right to a divorce and her consent to return were sufficient consideration to support the contract.

3. Husband and Wife—Contract for Separate Maintenance—Fraud in Execution—Evidence.—Evidence held not to show that a husband was deceived in the execution of a contract with his wife for her separate maintenance, in case she should be compelled to leave him in the future.

JOHNSON & HIBATT for appellant.

CARROLL & MIDDLETON and HELM & HELM for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Affirming.

Appellant is a member of an old and respectable family in Louisville, Ky. He received from his father's estate a considerable fortune. Appellee is an estimable lady of good parentage. After their marriage they resided in Louisville, and moved in what is known as the better circle of society. The income from the estate left to appellant was amply sufficient to support them comfortably. Not being burdened with the necessity of working for a living, appellant gave most of his time to society and social duties. His good fortune proved to be his undoing, for while leading a life of comparative idleness habits were acquired which were calculated to ruin his health, weaken his mentality, and deaden his sensibilities. These habits were indulged to such an extent that they undermined the whole fabric of his domestic life, and he became dissipated to such an extent as to excite the concern of his family and friends. It was agreed that he should go abroad with his wife and children, in the hope that a change of climate, surroundings, and associates would enable him to break away from habits which were wrecking his life and ruining his home.'

Accordingly he took his family and went to Europe. While on the way there he drank heavily, and after reaching his destination in Europe he continued to drink to excess, and this conduct on his part so changed his nature that finally, while in a drunken condition, he assaulted his wife and beat her up in a most shameful and disgraceful manner. This unhappy and unfortunate culmination of his protracted debauch resulted in his wife's leaving him. After the separation he manifested much concern for the wel-

fare of his wife and children, and expressed deep sorrow for his inexcusable treatment of her. When his wife had recovered from the effect of her injuries appellant induced certain of his friends and associates to intercede with her for the purpose of effecting a reconciliation, and, while devising ways and means to induce her to return to him, he manifested a willingness to do anything that would satisfy and induce her to consent to live with him again.

Chief among their friends who endeavored to effect an adjustment of the marital woes of this unhappy couple was William A. Dell, an American then sojourning in Europe, whose acquaintance they had formed, and who had, in the course of their stay in Europe, been thrown much with them. On several occasions, at the request of appellant, he called upon Mrs. Hite and talked to her and her friends over the possibility of her returning to her husband and the terms upon which she would be willing to do so. Other friends likewise took part in this effort to effect a reconciliation. Finally she agreed that she would be willing to resume the marital relations with him if he would cease drinking and treat her as a husband should and enter into an agreement with her to settle a sum upon her sufficient to maintain her and her children in a manner commensurate with their station in life and his financial standing, in the event he again treated her in such a manner that she could not live with him, and provided he would further agree that, in the event they again separated because of his wrongdoings, she should have entire custody and control of their children, free from any interference on his part. The terms upon which she expressed a willingness to return to him were com-

municated by Dell to appellant, and he readily agreed thereto.

After learning that the terms submitted by her were acceptable to her husband, she wrote to Hon. St. John Boyle, a lawyer and acquaintance and friend of hers in Louisville, Ky., and requested that he put in legal form her proposed agreement with her husband as outlined in her letter to him. This he did, and sent to her a writing which he said would amply protect her along the lines suggested, and which had been practically agreed upon by the parties. Appellant had all along, during the progress of the negotiations between himself and wife, insisted that they settle their differences themselves without the aid of attorneys, and, in order to avoid any possible chance of having the peace negotiations blocked, it was agreed among appellee's friends that Dell should copy the contract which had been prepared by St. John Boyle, and submit the copy so made by him to appellant. This he did, and after appellant had examined it, and fully considered its provisions, he agreed to it in its entirety, and expressed himself as more than pleased with it, and stated that, if it had been left to him alone, he would have been more liberal in dealing with his wife than she was asking him to be. Shortly thereafter he and his wife met and signed this contract and resumed their marital relations. The following is the contract in question.

"Caux Palace Hotel, Territet, Montreux.

"This agreement, made and entered into by Louis Hite and Mamie H. Hite, his wife, citizens of the United States and of the State of Kentucky, who are and have been living separate and apart, and as they believe it is for the good of their children and all

concerned that they should again live together as husband and wife, by way of settlement, agree as follows:

"(1)    That the said Louis Hite and Mamie H. Hite do hereby agree to live together as husband and wife.

"(2)    The said Louis Hite agrees to pay to the said Mamie H. Hite, his wife, the sum of one hundred ($100) per month for her sole and separate use.

"(3)    It is further agreed that, should it be necessary and proper for Mamie H. Hite, the said wife, to separate herself from and live apart from her said husband, by reason of any such conduct as would justify her separation from him, he will not oppose such a separation, and agrees that their said children shall remain in the custody of their mother, and that he will not undertake, by any proceedings at law or otherwise, to take possession or control of such children.

"(4)    In the event of any such condition arising as provided in the foregoing section, it is stipulated that any home in which they may then be living, together with all its contents and appurtenances, shall be under the control and disposition of the wife of the said Louis Hite for the use and benefit of herself and the said children, and that he will pay to his said wife, for the support of the said wife and children, the sum of five thousand ($5,000) dollars a year.

"(5)    In case of the death of said Louis Hite during any such separation, then it is stipulated that his wife shall receive such portion of the said Louis Hite's personal estate as she may be entitled to by law, and that he will devise to her, by his last will, one-third of the income as provided in the will of his father, and that if he should fail to make such will, or otherwise secure to her the payment of such one-

third then that his own estate shall be liable therefor.

"In testimony of all which the said parties have, in the presence of the subscribing witnesses, signed the foregoing instrument this 15th day of April, 1903.

"MAMIE H. HITE.<br>"LOUIS HITE.

"Witnesses:   M. HOTOP.
"C. L. AUBER."

For some time after their reconciliation, to all appearances, appellant lived up to his agreement and entirely left off the use of intoxicants, and during this time he and his wife, so far as can be gathered from the record, lived happily together.  They moved about from place to place in Southern Europe as inclination and fancy led them in quest of pleasure, and so long as he was true to his word and did not drink there was nothing in his conduct toward or treatment of his wife of which she might complain. In the course of their travels they were thrown frequently with their American friends, whom they had known before the date of their domestic troubles, as well as with new American acquaintances which they formed, and it is agreed that during this time appellant was not only a kind, thoughtful and indulgent husband, but a most genial, delightful, and entertaining companion. When drinking, however, his whole nature and disposition seemed changed, and he would become very unkind toward his wife and disagreeable toward his associates.

While out with a party of friends on a sleighing trip that was planned to cover several days, his wife discovered that he was drinking. Others of the party observed the same thing, and all noted that a marked change had come over him.  He became very ugly in

Hite v. Hite.

his manner toward his wife and their friends, and finally acted so badly that the party was broken up and the trip abandoned. They returned to their hotel, and this trip marked the beginning of the end. From that date their marital woes multiplied. He abused his wife, openly, and publicly insulted and humiliated her, and on one occasion so behaved toward her that, fearing he was again going to do her bodily harm, she fled from their apartments in the hotel to the public reception room and appealed to gentlemen there for protection. Appellant followed after her, and addressed a remark so insulting to a gentleman who asked what was the matter as to cause him to knock appellant down. Shortly thereafter appellee left her husband and returned to America and her home in Louisville, Ky., with two of her children.

In the course of time she brought suit for a divorce from bed and board and the enforcement of the contract herein referred to. Appellant defended, and in his answer, in addition to traversing the allegations of the petition, practically charged his wife with being criminally intimate with his friend, Dell, and alleged that the execution of the contract in question had been procured by fraud. He asked that the prayer of the petition be denied, and the contract be annulled. The affirmative matter in the answer was traversed. Much proof was taken by appellee in support of the charges set out in her petition. No proof was taken by appellant. The case was heard by the chancellor, and upon consideration thereof he entered a decree giving to appellee the relief sought as to the separation, and declared the contract valid and binding upon appellant. He appeals.

Appellant's mistreatment of his wife during the latter part of their married life is better understood

by a consideration of his general behavior toward her during this period, rather than by singling out particular acts of cruelty and unkindness, although the latter were amply sufficient to justify her in leaving him. But these particular acts of cruelty and threatened violence fade into insignificance when compared with his general behavior toward his wife during this time. It is shown by the evidence that he would sit around the lobby and corridors of the hotels and public places, and in the presence of friends, strangers, and servants act as though his wife was not conducting herself properly and he was spying on her in an effort to detect her improper behavior toward or relations with some one. Such conduct on his part was very annoying to his wife, and, while embarrassing in the extreme at times, it might have been excused on account of his drunken condition, and borne by his wife, if he had been content to stop at that. But it seems he was not. He acted as though he expected her to withdraw herself entirely from the society of the friends and acquaintances whom he had made and selected for her, and retire to the seclusion of her room, and there remain during his protracted sprees. When she did not do so, he sought by hints dropped to her in the presence of others, to insinuate that she was not conducting herself as a lady should, and was too intimate with his friend Dell. It was this conduct on his part toward her that created the chasm that could not be bridged. She could stand, and even forgive, the cruel and stinging blows which in his madness and delirium he had rained upon her face with his bare fist, but when he sought, by act and word, to destroy her good name and rob her in the eyes of the world of her purity and wifely virtue, she openly rebelled, her whole nature revolted, and any

love or respect which she had for him was changed to hate, and she fled from him as from a pestilence.

His conduct toward her, during the period under consideration, is shown by the record to have been in keeping with his conduct during the progress of the trial.   To his wife's plea for a partial divorce and separate maintenance, his defense is an attack upon her reputation as a virtuous woman, and an insinuation that, because of her misconduct he was driven to drink. No word of proof has been offered by him in support of either charge, presumably because none was to be found. It is neither surprising nor unreasonable to believe that one who would make such charges against the mother of his children without some evidence upon which to base them would be guilty of the cruel and inhuman treatment with which appellant is charged and proven to have shown his wife. It is a singular fact that at no time during their entire married life, except when he was under the influence of liquor did appellant find any complaint with his wife on account of her association with any of their friends, and particularly is this true with regard to the friends and acquaintances formed by them while in Europe. It was but natural that they, being Americans sojourning in a country among strangers and people whose customs, habits, and language were altogether different from their own, should have selected as their friends such of their countrymen as they found where they were stopping, and while the record shows that these American friends were thrown with appellant and appellee a great deal, there is nothing in it indicating in the slightest that at any time appellee conducted herself in any manner other than as a lady should under like

circumstances. Appellant was altogether at fault, and in adjudging to her a separate maintenance, the chancellor rendered a most righteous judgment.

This leaves for our consideration the question of the correctness of the chancellor's ruling in upholding the validity of the contract under consideration. At the time the contract was executed, the parties to it were living apart. The wife had just recovered from the effects of the terrible beating which her husband had given her. She had an unquestionably good cause for divorce, which would carry with it alimony. This right she was unwilling to waive and again resume the marriage state with her husband unless he would make suitable provisions for her support in the event she was again compelled to leave him. He wanted her to return to him, and was willing to conform to her request and wishes in this particular to induce her to do so. This was ample consideration to support the contract, and, as said by this court in the case of Woodruff v. Woodruff, 121 Ky. 784, 90 S. W. 266, 91 S. W. 265, 28 Ky. Law Rep. 757, 1082, in construing a similar contract: "it simply secured to her something in consideration of her foregoing the rights she then had. * * * It (the law) favors the reconciliation of husband and wife. A contract for the re-establishment of a ruined home is one which equity is swift to approve. Whether the contract in question is contrary to public policy is not to be determined from one clause of it, but from the whole instrument. The contract as a whole does not tend to produce estrangement between husband and wife. They were already estranged. The contract brought them together, and, taken as a whole, it is in aid of the marital relation, and is therefore not opposed to public policy, but in accord with it."

Thus its execution is sanctioned by the law and it should be upheld unless appellant's contention that he was deceived in its execution is supported by the proof.

Turning to this, we find that for some time prior to the date of its execution he had expressed a willingness, in fact, a desire, to enter into such a contract with his wife, and when the contract in question was presented to him, he read it over and fully advised himself as to its provisions before it was executed, and he expressed himself as more than satisfied with the reasonableness of its provisions. There is no proof to the contrary. The fact that an attorney advised Mrs. Hite as to the form of the contract can be of no avail. It is not form, but substance alone, of which he might justly complain. That he fully understood the terms of the contract there is not the slightest doubt, and as the provision therein made for his wife is no more than the chancellor would have been justified in allowing her, considering her station in life and his annual income which is shown to be from $10,000 to $15,000, we see no reason why he should be relieved from the contract into which he voluntarily entered, and which seems to us to be both equitable and just.

Judgment affirmed.